IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MedChoice Financial, LLC, | : | |
| Plaintiff | : | Civil Action 2:11-cv-00212 |
| v. | : | Judge Frost |
| ADS Alliance Data Systems, Inc., *et al.*, | : | Magistrate Judge Abel |
| Defendants | : | |
| and | : | |
| Phillip W. Hall, *et al.*, | : | |
| Additional Counterclaim Defendants | : | |

**ORDER**

This matter is before the Magistrate Judge on defendants/counterclaim plaintiffs ADS Alliance Data Systems, Inc. and World Financial Network Bank's June 27, 2012 motion to compel (doc. 53).

Background. This is a breach of contract action. The complaint makes the following allegations. In 2005, the World Financial Network Bank entered a contract with MedChoice to underwrite private label credit cards MedChoice issued to patients of the healthcare providers that comprised MedChoice's exclusive provider network. Under the contract, MedChoice and the Bank were to share the profits generated.

1

MedChoice collected fees from the extension of credit to the providers' patients. In 2009, the last full year the contract was in place, the MedChoice private label credit cards generated more than $10 million per month in revenues. In May 2009, the Bank and its parent company, ADS, expressed their interest in buying MedChoice. When the parties were unable to agree on terms of a sale, ADS and the Bank implemented a scheme to limit MedChoice's business opportunities with its providers, to restrict and subsequently cut off MedChoice's cash flow, and ultimately to terminate the parties' contract for pretextual reasons that were ADS's and the Bank's own creation. Within days of the wrongful termination, ADS and/or the Bank signed MedChoice's largest and most profitable provider as a direct customer. The Bank also breached the contract by failing to pay certain contractual "yield share" and "hold back" amounts to MedChoice.

The Bank has filed counterclaims against MedChoice and against additional counterclaim defendants Philip Hall and Michelo A. Naturile. The counterclaims plead that the Program Agreement authorized MedChoice to submit credit card charges to the Bank only for "Goods and/or Services" rendered by "Providers" to "Clients" of those "Providers." The definitions of "Client" and "Providers" limited credit card charges to charges for goods or services listed in the definition of "Elective Cosmetic Surgery" contained in Exhibit 1 to the Program Agreement. MedChoice, without the Bank's knowledge, repeatedly submitted charges for goods or services that were not

permitted under the Program Agreement, including, among others, charges for fertility services and vitamins.

In August 2009, the Bank learned that MedChoice had been submitting charges for fertility services. On August 31, 2009, the Bank advised MedChoice and Hall that "fertility is not an approved procedure" under the Program Agreement. In October 2009, the Bank directed Hall to remove the following industries and store numbers from MedChoice's data base: any fertility and women's centers, any drug rehabilitation centers, "complementary healthcare," and "mobile anesthesiologists." On January 12, 2010, the Bank reiterated its demand that all fertility and rehabilitation services providers need to be terminated because they do not qualify under the Program Agreement.

In or about January 2010, the Bank learned that MedChoice was also submitting charges for the sale of vitamins. The bank notified MedChoice that charges for vitamins were also not permitted under the Program Agreement and demanded that MedChoice process charges only for approved procedures. The Bank then charged back to MedChoice all outstanding Cardholder balances for the unauthorized vitamin charges, as it was entitled to do under the Program Agreement.

After these notices, the counterclaim defendants devised a fraudulent scheme to continue to submit unauthorized charges, by submitting those charges to the Bank for unauthorized procedures under a false Provider name -- "Surgery Loans Direct." At least $844,000 worth of MedChoice's charge transactions for fertility treatments

3

occurred after the Bank reiterated to MedChoice that such charges were not authorized under the Program Agreement. By the time the Bank discovered the fraud, MedChoice had only approximately $15,000 in cash and was unable to pay the chargebacks that the Bank was entitled to make under the Program Agreement, resulting in hundreds of thousands of dollars in damages to the Bank.

In late 2008, MedChoice had a large number of chargebacks associated with one of MedChoice's providers, Body Solutions, which the Bank offset from Net Proceeds otherwise payable to MedChoice. Unbeknownst to the Bank, MedChoice did not have sufficient financial reserves to cover these chargebacks. MedChoice thereafter began to have financial difficulties, which it failed to disclose to the Bank, in breach of section 5.1 of the Program Agreement. Hall instructed others at MedChoice not to disclose these financial difficulties to the bank.

Under the Program Agreement, MedChoice was responsible for all settlements with Providers. However, unbeknownst to the Bank, MedChoice began to fail to settle with Providers. The counterclaim defendants told those Providers that the reason Med-Choice had not paid them was that the Bank had not paid MedChoice and had "cut off" the providers, when in fact the Bank had already paid MedChoice the amounts that Med-Choice owed those Providers.

Discussion. Defendants/counterclaim plaintiffs ADS Alliance Data Systems, Inc. and World Financial Network Bank seek an order compelling the production of four types of documents:

(1) Documents relating to the relationships between MedChoice/Hall and the affiliated entities, as well as documents from which transfers among and between these various entities can be discovered and verified. The requests seek documents relating to bank accounts (which would reveal transfers of funds), cancelled checks and federal tax returns (and documents relating thereto) of these affiliated entities. (Interrogatory 1 and Request for Production of Documents ("RPD") 75, 77, 79, & 81).

(2) Documents relating to the personal financial activity of Hall during the time periods relevant to the litigation. These requests seek documents relating to bank accounts maintained by Hall, his financial statements (and documents relating thereto), copies of cancelled checks, tax returns (and documents relating thereto), and withdrawals made from an account in Hall's wife's name that were subsequently deposited into a MedChoice account. (This request was propounded specifically to substantiate paragraph 36 of defendants' counterclaim, which alleged that Hall withdrew $70,000 from his wife's bank account and deposited it into a MedChoice account in order to cover up a previous transfer of MedChoice's funds. ) (RPDs 71, 72, 76, 80, 81, 148).

(3) Documents relevant to the financial condition of MedChoice during the time periods relevant to the litigation. These requests seek documents relating to credit charges incurred by MedChoice (which are also relevant to whether Hall appropriated business funds for his own use), debt or equity requests or

solicitations made by MedChoice, and lawsuits against and/or investigations of MedChoice during the life of the program agreement (or relating to events during the operations of the program agreement). (RPDs 82, 85, 108-112).

(4) Other relevant documents relating to MedChoice's payments to providers and brokers, actual or potential alternative sources of financing of MedChoice, and MedChoice telephone records and invoices. (RPDs 32, 49, 147).

<u>Documents Relating to the Affiliated Entities.</u> Defendants argue that the documents and information that they seek are relevant to their defenses and to prosecuting their corporate veil piercing claims. According to defendants, evidence suggesting that MedChoice's inability to pay its obligations to its providers resulted from Hall's mismanagement and misappropriation of funds is highly relevant to MedChoice's claims that the actions of defendants created MedChoice's financial problems. Defendants maintain that courts permit discovery of individuals and related entities in order to explore the factual basis of a piercing allegation. Defendants allege that Hall transferred funds between various entities and used such transfers a tool to avoid paying a monetary judgment. As a result, defendants contends that financial records relating to the capitalization and operation of these entities is highly relevant to determining the extent to which Hall exercised control and the extent to which funds which should have gone to pay MedChoice's providers were used to capitalize and operate other entities. Defendants specifically seek the identification of all bank accounts of any affiliated entity of MedChoice; documents related to any account at a

6

financial institution held by one ore more of four specifically-identified affiliated entities; documents that indicate individuals authorized to sign checks drawn on the identified affiliated entities' accounts; copies of cancelled checks written after September 20, 2005 on any account held by one of the identified affiliated entities; and tax returns and supporting documentation of the identified related entities.

Plaintiff maintains that defendants are improperly seeking documents from other business entities owner or operated by Hall through discovery requests directed to MedChoice. Although defendants refer to these entities as "affiliated entities," plaintiff maintains that they are stand-alone business entities that are not related to plaintiff other than by virtue of Hall's interest or participation in them. These entities are not parent companies or subsidiaries of MedChoice, nor do they compose part of a structure of interrelated businesses. Furthermore, the documents sought by defendants are not in the possession, custody, or control of MedChoice, and MedChoice has not obligation to collect or produce them. Although defendants eventually served discovery requests on Hall, plaintiff maintains that the motion to compel is premature with respect to Hall given that his responses were not due until July 30, 2012.

Plaintiff also argues that courts do not permit wide-ranging discovery into the finances of non-party individuals or entities that are not alleged to be alter egos of the corporate entity whose veil is sought to be pierced. According to plaintiff, defendants' only allegations with respect to the other entities are that Hall may have transferred funds between them and MedChoice. MedChoice has already agreed to produce all

7

documents that reflect, refer, or relate to the transfer of any funds or assets between MedChoice and the other entities. Plaintiff argues that defendants' other requests for documents relating to the other documents are not relevant to the claims and allegations in this lawsuit.

I conclude that the motion to compel as to Hall is ripe for review, and hold that Hall must produce all relevant documents in his possession or under his control. I also conclude, however, that defendants have not made a sufficient showing that the tax returns of the "affiliated entities" are likely to contain relevant information. Hall is ORDERED to produce records of any transfer of funds Hall's entities made to/from MedChoice.

Defendants' motion to compel is GRANTED with respect to interrogatory 1, but it is DENIED with respect to RPDs 75, 79 & 81, which are overbroad and burdensome. Nonetheless, MedChoice is ORDERED to identify all bank accounts of any affiliated entity of MedChoice, but is not required to produce the documents related to any account at a financial institution held by one or more of four specifically-identified affiliated entities or produce copies of cancelled checks written after September 20, 2005 on any account held by one of the identified affiliated entities. Defendants' motion to compel is GRANTED with respect to RPD 77. MedChoice is ORDERED to produce those documents that indicate individuals authorized to sign checks drawn on the identified affiliated entities' accounts.

Documents Relating to Hall's Personal Finances. Defendants argue that they are entitled to documents relating to Hall's personal finances because they are necessary to establish the degree of financial inseparability between Hall and MedChoice. Specifically, they seek Hall's financial statements and all supporting documentation; identification and documents relating to bank accounts held wholly or partially in Hall's name; copies of any cancelled checks issued from any account in Hall's name; Hall's income tax returns and related documentation; and documents relating to any withdrawal of funds by Hall from his wife's account thereafter deposited into a MedChoice account.

Plaintiff argues that as of the day prior to the filing of the motion to compel, defendants had not propounded a single discovery request to Hall in his personal capacity. As previously stated, the motion to compel is not premature with respect to Hall.

According to defendants, Hall has agreed to produce sufficient documents relating to his own finances. As a result, defendants withdrew the motion to compel with respect to requests for productions of documents numbers 71, 81 and 148. Hall has refused to produce documents responsive to requests 72, 76 and 80.[1] Defendants maintain that they are entitled to copies of all of the back up documentation and communications in order to trace the flows of money between and among Hall and his various business interests. MedChoice and Hall have failed to demonstrate that the

---

[1]These are RPDs 4, 2, and 7 in the requests submitted to Hall.

production would be burdensome, and the documents requested are relevant. Defendants' motion to compel is GRANTED with respect to 72, 76 and 80. Hall is ORDERED to produce the backup documentation and emails or other communications relating to his financial statements. Halt is also ORDERED to produce information relating to his bank accounts that are within his possession, custody or control.

<u>Documents Relating to MedChoice's Financial Condition during the Program Agreement.</u> Defendants maintain that the financial status and solvency of MedChoice is also relevant to its piercing inquiry. Defendants allege that Hall concealed MedChoice's financial difficulties from the Bank through a variety of means, such as transferring funds between his related entities. Specifically, defendants seek all documentation regarding credit card charges incurred by MedChoice; documentation relating to any application or solicitation for investment or capitalization to MedChoice; and documentation regarding lawsuits and investigations involving MedChoice and occurring during the life of the program whether or not they relate directly to the program agreement and after the agreement was terminated if they relate to events taking place during the operation of the agreement. Defendants maintain that MedChoice's credit card charges are relevant to whether Hall was using MedChoice's credit accounts for his own benefit and to the underlying fraud claims asserted in their counterclaim. Defendants maintain that Hall concealed MedChoice's true financial status from the Bank in order to coerce continued payments for services under the program agreement.

Plaintiff argues that the documents that it has already agreed to produce will provide defendants with a full picture of MedChoice's financial condition and solvency at all times relevant to this lawsuit. Plaintiff argues that defendants' additional requests are not designed to obtain any additional, meaningful information. For instance, there is no reason defendants require every document related to any credit card charge ever incurred by MedChoice to evaluate their allegations. Plaintiff maintains that this request is oppressive and patently overly broad. According to plaintiff, defendants' request for documents relating to any accusation of wrongdoing by MedChoice by anyone at any time having no relation in time or substance to the matters at issue in this lawsuit are vague, overly broad, and harassing.

Defendants' motion to compel with respect RPD 82 is GRANTED in PART. MedChoice is DIRECTED to provide defendants with documentation of credit card charges incurred by MedChoice for a six-month period selected by defendants' counsel.

Defendants' motion to compel with respect to RPD 85 is GRANTED. If MedChoice applied for a loan or sought equity investment for its business and provided information concerning the financial condition of the company, these admissions are relevant to demonstrate MedChoice's financial condition and to determine whether it took steps to mitigate its damages.

Defendants request for documentation regarding lawsuits and investigations involving MedChoice and occurring during the life of the program whether or not they relate directly to the program agreement and after the agreement was terminated if they

11

relate to events taking place during the operation of the agreement (RPDs 108-112). The motion to compel is GRANTED in part with respect to these requests. MedChoice is ORDERED to produce documents response to RPDs 108 and 109 to the extent that the documents are not privileged. In some respects RPDs 110, 111 and 112 are duplicative of RPDs 108 and 109 and responsive documents should be provided pursuant to RPDs 108 and 109. To the extent RPDs 110, 111 and 112 seek documents concerning accusations or unidentified investigations, the motion to compel is DENIED.

Remaining Requests. Defendants also seek documents relating to MedChoice's actual and/or potential sources of financing other than the Bank, which they maintain is relevant to MedChoice's allegation that the Bank breached an implied obligation of good faith and fair dealing through certain of its policies, procedures, and credit practices. Additionally, defendants seek documents reflecting the timeliness of MedChoice's payments to providers or brokers. Defendants allege that MedChoice failed to pay providers as required under the program agreement and that MedChoice and Hall committed fraud by submitting transactions under false provider names. Finally, defendants seek MedChoice's telephone records and invoices, which they maintain will be helpful in establishing the date and time of various events as well as the parties involved.

MedChoice argues that documents related to its potential sources of funding is simply irrelevant as to why defendants deviated from the parties' established course of conduct and changed their policies. Policies and procedures that may have been a part

of any other potential funding provider's plan is irrelevant to this issue. MedChoice also argues that it has already agreed to produce all non-privileged documents concerning the timeliness of its payments to providers and brokers. MedChoice further argues that defendants' attempt to obtain wide-ranging discovery into every payment made by MedChoice to any broker or provider is overly broad, oppressive and is nothing short of a fishing expedition. With respect to its telephone records, MedChoice maintains that defendants' request is grossly overbroad. MedChoice argues that there are far less intrusive ways for defendants to establish the date and time of various events.

RPD 32 seeks documents relating to MedChoice's actual or potential sources of financing other than the bank. Defendants' motion to compel is GRANTED with respect to any efforts made by MedChoice to mitigate its damages.

Defendants' motion to compel with respect to RPD 49 is GRANTED. These documents are relevant to defendants' allegations that MedChoice failed to settle with Providers and told them that the reason MedChoice had not paid them was that the Bank had not paid MedChoice and had "cut off" the providers. Defendants maintain that the Bank had already paid MedChoice the amounts that MedChoice owed those Providers. While relevant, I recognize that the request for "every document" relating to MedChoice's payments to providers or brokers might be burdensome. If MedChoice claims burdensomeness as to documents reflecting routine accounting for those payments, it must describe the documents, how they are kept, and how they are accessed to defendants' counsel and provide defendants' counsel with a representative

13

sampling of those documents for a timeframe designated by defendant's counsel Any document giving reasons why MedChoice had not paid providers or brokers must be produced. All summary documents must be produced.

Defendants' motion to compel with respect to RPD 147 is DENIED. Defendants have not demonstrated the relevancy of the telephone records.

For the reasons stated above, defendants/counterclaim plaintiffs ADS Alliance Data Systems, Inc. and World Financial Network Bank's June 27, 2012 motion to compel (doc. 53) is GRANTED in part and DENIED in part.

Under the provisions of 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P., and Eastern Division Order No. 91-3, pt. F, 5, either party may, within fourteen (14) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge. The motion must specifically designate the Order, or part thereof, in question and the basis for any objection thereto. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

s/Mark R. Abel  
United States Magistrate Judge