IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MedChoice Financial, LLC,                    :

            Plaintiff                 :        Civil Action 2:11-cv-00212

    v.                                      :        Judge Frost

ADS Alliance Data Systems, Inc., *et al.,*   :        Magistrate Judge Abel

           Defendants                :

and                                          :

Phillip W. Hall, *et al.,*                   :

           Additional Counterclaim   :
           Defendants

                                 :

## Order

Plaintiff MedChoice Financial, LLC brought this action against defendants ADS

Alliance Data Systems, Inc. and World Financial Network Bank alleging that they

breached a contract under which they underwrote private label credit cards MedChoice

issued to patients of the healthcare providers that comprised MedChoice's exclusive

provider network.[1] ADS and the Bank have filed a counterclaim that alleges MedChoice

---

[1]The amended complaint also pleads claims for tortious interference with
contracts, unjust enrichment, breach of fiduciary duty, and violations of Ohio Revised
Code §§ 1333.61, *et seq.*, 1301.01, *et seq.*, and 4165.01, *et seq.*

and counterclaim defendant Philip Hall breached the contract and committed fraud.[2]

On October 26, 2012, I issued an order granting, in part, the June 27, 2012 motion of ADS and the Bank to compel MedChoice and Hall to provide them discovery. (Doc. 61.) This matter is now before the Magistrate Judge on the February 1, 2013 motion of ADS and the Bank for sanctions for the failure of MedChoice and Hall to provide the discovery ordered and to compel them, once again, to provide it. (Doc. 63.)

**Facts pleaded regarding the claims and defenses of the parties.** My October 26 Order summarized the facts underling the dispute as follows:

> . . . Under the contract, MedChoice and the Bank were to share the profits generated. MedChoice collected fees from the extension of credit to the providers' patients. In 2009, the last full year the contract was in place, the MedChoice private label credit cards generated more than $10 million per month in revenues. In May 2009, the Bank and its parent company, ADS, expressed their interest in buying MedChoice. When the parties were unable to agree on terms of a sale, ADS and the Bank implemented a scheme to limit MedChoice's business opportunities with its providers, to restrict and subsequently cut off MedChoice's cash flow, and ultimately to terminate the parties' contract for pretextual reasons that were ADS's and the Bank's own creation. Within days of the wrongful termination, ADS and/or the Bank signed MedChoice's largest and most profitable provider as a direct customer. The Bank also breached the contract by failing to pay certain contractual "yield share" and "hold back" amounts to MedChoice.
> 
> The Bank has filed counterclaims against MedChoice and against additional counterclaim defendants Philip Hall and Michelo A. Naturile. The counterclaims plead that the Program Agreement authorized MedChoice to submit credit card charges to the Bank only for "Goods and/or Services" rendered by "Providers" to "Clients" of those "Providers." The definitions of "Client" and "Providers" limited credit card charges to charges for goods or services listed in the definition of "Elective

_____

[2]The counterclaim also seeks to pierce MedChoice's corporate veil to make Hall liable for MedChoice's actionable conduct. It further pleads claims for aiding and abetting fraud and defamation.

Cosmetic Surgery" contained in Exhibit 1 to the Program Agreement. MedChoice, without the Bank's knowledge, repeatedly submitted charges for goods or services that were not permitted under the Program Agreement, including, among others, charges for fertility services and vitamins.

In August 2009, the Bank learned that MedChoice had been submitting charges for fertility services. On August 31, 2009, the Bank advised MedChoice and Hall that "fertility is not an approved procedure" under the Program Agreement. In October 2009, the Bank directed Hall to remove the following industries and store numbers from MedChoice's data base: any fertility and women's centers, any drug rehabilitation centers, "complementary healthcare," and "mobile anesthesiologists." On January 12, 2010, the Bank reiterated its demand that all fertility and rehabilitation services providers need to be terminated because they do not qualify under the Program Agreement.

In or about January 2010, the Bank learned that MedChoice was also submitting charges for the sale of vitamins. The bank notified MedChoice that charges for vitamins were also not permitted under the Program Agreement and demanded that MedChoice process charges only for approved procedures. The Bank then charged back to MedChoice all outstanding Cardholder balances for the unauthorized vitamin charges, as it was entitled to do under the Program Agreement.

After these notices, the counterclaim defendants devised a fraudulent scheme to continue to submit unauthorized charges, by submitting those charges to the Bank for unauthorized procedures under a false Provider name -- "Surgery Loans Direct." At least $844,000 worth of MedChoice's charge transactions for fertility treatments occurred after the Bank reiterated to MedChoice that such charges were not authorized under the Program Agreement. By the time the Bank discovered the fraud, MedChoice had only approximately $15,000 in cash and was unable to pay the chargebacks that the Bank was entitled to make under the Program Agreement, resulting in hundreds of thousands of dollars in damages to the Bank.

In late 2008, MedChoice had a large number of chargebacks associated with one of MedChoice's providers, Body Solutions, which the Bank offset from Net Proceeds otherwise payable to MedChoice. Unbeknownst to the Bank, MedChoice did not have sufficient financial reserves to cover these chargebacks. MedChoice thereafter began to have financial difficulties, which it failed to disclose to the Bank, in breach of section 5.1 of the Program Agreement. Hall instructed others at MedChoice not to disclose these financial difficulties to the bank.

> Under the Program Agreement, MedChoice was responsible for all settlements with Providers. However, unbeknownst to the Bank, MedChoice began to fail to settle with Providers. The counterclaim defendants told those Providers that the reason MedChoice had not paid them was that the Bank had not paid Med-Choice and had "cut off" the providers, when in fact the Bank had already paid MedChoice the amounts that MedChoice owed those Providers.

(Doc. 61, PageID 883-86.)

**Alleged violations of the October 26 Order/Discovery sought.** ADS and the Bank assert that MedChoice and Hall failed to (1) identify bank accounts held in the name of MedChoice's affiliated entities (Interrogatory No. 1); (2) produce bank statements and related documentation from financial accounts held in the name of Phillip Hall (Requests for Production Nos. 72, 76 and 80); (3) produce documents relating to credit card charges incurred by MedChoice (Request for Production No. 82); and (4) produce documents relating to MedChoice's payment to providers and brokers (Request for Production No. 49). ADS and the Bank seek an immediate response to Interrogatory No. 1 and immediate production of the documents sought by Requests for Production Nos. 71, 75 and 81. They also request sanctions under Rule 37(a)(5)(A), Rule 37(b)(2)(A), and Rule 37 (b)(2)(C), Fed. R. Civ. P.

**Discussion.** I will now consider MedChoice's and Hall's responses to each of the four categories of documents identified above.

**(1) Bank accounts held in the name of MedChoice's affiliated entities (Interrogatory No. 1).** The October 26 Order found that this interrogatory was relevant to defendants' defense that MedChoice and Hall directed money needed for MedChoice to

4

meet its obligations under the contract to the affiliated entities. MedChoice and Hall were ordered to answer the interrogatory. They did so, identifying two bank accounts.

That, however, was not an accurate answer to the interrogatory. After October 26 MedChoice and Hall produced 12 gigabytes of ESI records, consisting of 195,308 documents with an unknown number of pages, as well as more than 8,700 Bates-labeled pages. (March 1, 2013 Declaration of Lindsey Stinchcomb, ¶ 3, Doc. 66-1, PageID 998.) But the ESI included many irrelevant, nonresponsive documents and was not organized in a way that the responsive documents could be easily located. Defendants' counsel spent considerable time and money separating the relevant from the irrelevant. (March 18, 2013 Declaration of Loriann E. Fuhrer, ¶ 3, Doc. 71-2, PageID 1080)("Fuhrer 3d Decl., ¶ __." During that process, defendants' counsel discovered two additional bank accounts held in the name of the MedChoice affiliated entity MedLease, LLC at a previously undisclosed bank, Bank Atlantic. (Fuhrer 3d Decl., ¶ 4, PageID 1081.) In addition, a November 14, 2008 letter from William Doniger, a MedChoice employee, to Hall talk about moving funds from Bank Atlantic to new National City bank accounts. (Fuhrer 3d Decl., ¶ , Ex. B, PageID 1086.) Yet MedChoice and Hall have so far only identified accounts at Bank of America and PNC.

Defendants' counsel found references to these accounts by carefully searching the 12 gigabyte document dump MedChoice and Hall made in response to their requests for production of documents. Rule 34(b)(E)(i), Fed. R. Civ. P. provides:

> A party must produce documents as they are kept in the ordinary course

5

> of business or must organize and label them to correspond with the
> categories of the request . . . .

Plaintiffs' counsel did neither. They "reviewed MedChoice and Mr. Hall's ESI only for privilege and not for substance prior to production."   (December 13, 2012 Email from Andrea Perry Block to Lori Fuhrer and Tom Hill, Fuhrer 2d Decl., Ex. D, PageID 936.) Had plaintiffs' production complied with the Rule, they would likely have found the Bank Atlantic and National City accounts. In any event, it is clear that neither Hall nor MedChoice made a thorough search before answering Interrogatory No. 1. Their conduct is sanctionable. They had the obligation to make a thorough search to identify and produce all bank accounts and bank statements in their possession or under their control.[3] They must institute a thorough search that not only includes talking with the person's most knowledgeable about MedChoice's and Hall's accounts but also asking the persons in the affiliated entities most likely to know the bank accounts held by those entities to provide them with all available information about their accounts.[4] Then Hall

---

[3]Hall searched only for bank accounts and bank statements in his possession. February 28, 2013 Declaration of Phillip Hall, ¶ 10, PageID 1003.)

[4]MedChoice's and Hall's attempt to distance themselves from the affiliated entities is unconvincing. They assert that the affiliated entities are not parent companies or subsidiaries of MedChoice, that they are not interrelated businesses, and that Hall did not manage the finances and day-to-day operations of the entities.(March 1, 2013 Memorandum in Opposition, Doc. 66, p. 4, PageID 986; February 28, 2013 Declaration of Phillip Hall, ¶ 6.) But defendants' counsel have uncovered documents that demonstrate those assertions are not entirely accurate. For example, In December 2006, MedChoice had a 45% ownership interest in MedLease. (Fuhrer 3d Decl., Ex. D, PageID 1088.) In connection with an application for enrollment in Bank Atlantic's Business Online Banking Cash Management services, Hall represented himself to be a managing member of MedLease. (Fuhrer 3d Decl., Ex. F, PageID 1090.) Hall was the president of

and MedChoice are ORDERED to further supplement their response to Interrogatory

No. 1 within **fourteen (14) days of the date of this Order.**

        **(2) <u>Bank statements and related documentation from financial accounts held in</u>**

**<u>the name of Phillip Hall (Requests for Production Nos. 72, 76 and 80)</u>.** As discussed

above, Hall searched only for bank statements in his possession.[5] That is a violation of

the October 26, 2012 Order. (Doc. 61, p. 10, PageID 892.) He produced only two bank

statements. He states that defendants have issued subpoenas to his banks seeking those

records and that he did not oppose the subpoenas. He further asserts that to the extent

the banks do not produce the records, he will.

        The fact that Hall's noncompliance with the October 26 Order forced defendants

to issue subpoenas to the banks where they know Hall has accounts is not a defense to

the motion for sanctions. Defendants have the right to have Hall identify each bank

account and to produce the bank records in his possession, custody or control. While

they could have entered an agreement for Hall to request that the banks send the

statements to defendants' counsel, that time has passed. Hall chose to disregard his

obligations as a party to this lawsuit to provide the requested discovery. As ordered

above, Hall is ORDERED to supplement his production of documents responsive to

Requests for Production Nos. 72, 76 and 80 within **fourteen (14) days of the date of this**

---

MedChoice Credit Services Corp. (Fuhrer 3d Decl., Ex. H, PageID 1092.) MedChoice
Settlement LLC was a subsidiary of MedChoice. (Fuhrer 3d Decl., Ex. J, PageID 1095.)

      [5]Hall Decl., ¶ 10, PageID 1003.

Order.

(3) **Documents relating to credit card charges incurred by MedChoice (Request for Production No. 82).** On December 4, 2012, defendants' counsel asked plaintiffs to produce these records for the period December 1, 2009 through May 31, 2010. (Fuhrer 2d Decl., Ex. A, PageID 927.) On December 7, 2012, MedChoice's counsel told defendants' counsel they would provide descriptions of the documents and how they could be accessed by December 14. (February 1, 2013 Declaration of Loriann Fuhrer, Ex. B, PageID 929.) On January 8, defendants' counsel again asked for the credit card charges. MedChoice's counsel did not respond, and defendants filed their motion for sanctions. On February 22, 2013, defendants' counsel wrote MedChoice's counsel seeking access to the documents. (Fuhrer 3d Decl., ¶ 6 and Ex. V, PageID 1115.) On March 14, 2013, MedChoice's counsel for the first time said that the records were in a web-based system called XRMS. (Fuhrer 3d Decl., ¶ 6 and Ex. V, PageID 1083 and 1115-16.) But plaintiffs did not produce the documents.

MedChoice counters that on January 23, 2013 it did produce paper copies of the requested documents for the six-month period selected by defendants. They were Bates-stamped H-278655 through 278693. (Stinchcomb Decl., ¶ 5, Doc. 66-1, PageID 999.) Defendants respond that the documents produced were not credit card but debit card statements. If MedChoice has no credit cards and is using debit cards as credit cards, then it has at least one other debit card. (Fuhrer 3d Decl., Ex. EE, PageID 1167-70.)

If the debit card documents were meant to be responsive to Request for

Production No. 82, MedChoice should have so stated when the documents were produced. Rule 34(b)(E)(i), Fed. R. Civ. P. Defendants have the right to a formal response to the document request. If the production is complete, that formal response should so state. If not, it is ORDERED that the remaining documents be produced within **fourteen (14) days of the date of this Order.**

(4) <u>**Documents relating to MedChoice's payment to providers and brokers (Request for Production No. 49).**</u> The request seeks all documents that evidence, reflect, refer to, or relate to any payments made by MedChoice to its providers and/or brokers. The October 26 Order provided:

> Defendants' motion to compel with respect to RPD 49 is GRANTED. These documents are relevant to defendants' allegations that MedChoice failed to settle with Providers and told them that the reason MedChoice had not paid them was that the Bank had not paid MedChoice and had "cut off"the providers. Defendants maintain that the Bank had already paid MedChoice the amounts that MedChoice owed those Providers. While relevant, I recognize that the request for "every document" relating to MedChoice's payments to providers or brokers might be burdensome. If MedChoice claims burdensomeness as to documents reflecting routine accounting for those payments, it must describe the documents, how they are kept, and how they are accessed to defendants' counsel and provide defendants' counsel with a representative sampling of those documents for a timeframe designated by defendant's counsel Any document giving reasons why MedChoice had not paid providers or brokers must be produced. All summary documents must be produced.

(Doc. 61, pp. 12-13, PageID 895-96.)

On December 7, 2012, plaintiffs' counsel informed defendants' counsel that MedChoice asserted the production would be burdensome without further explanation

9

and said they would provide defendants with a description of all the documents and a description of how they could be accessed by December 14. (Fuhrer 2d Decl., Ex. B, PageID 929.) When the promised information was not forthcoming, defendants' counsel emailed plaintiffs' counsel on January 8 asking for it. Plaintiffs' counsel did not respond. (Fuhrer 2d Decl., ¶ 6 and Ex. E, PageID 924 and 940.) As of the February 1, 2013, when the motions for sanctions was filed, plaintiffs had not provided any information demonstrating that production of the documents would be burdensome and had not produced the documents.

On February 22, 2013, plaintiffs' counsel emailed defendants' counsel that "MedChoice tracked its acct. for payments to providers and brokers using a web-based system called XRMS." Plaintiffs' counsel offered a detailed explanation about how data was entered into XRMS, giving a detailed example. MedChoice agreed to providing defendants with a representative sampling of the documents. (March 1, 2013 Declaration of Ronald T. Coleman, Jr., ¶ 5 and Ex. A, PageID 1008 and 1010-11.) Although MedChoice blames the failure to provide this information earlier on a miscommunication between Mr. Coleman and an associate (Coleman Decl., ¶¶ 4-5, PageID 1008), defendants were forced to file this motion for sanctions to obtain a response to their counsel's January 8 email. Moreover, as discussed below, plaintiffs still refuse to produce the documents in an electronic form.

On March 6, 2013, defendants' counsel emailed plaintiffs' counsel requesting production of documents from the XRMS database in an electronic form. Further, if

10

MedChoice was claiming that an electronic production was burdensome, it should

"specifically explain the burden in quantifiable terms." (Fuhrer 3d Decl., ¶ 7 and Ex. W,

PageID 1083 and 1118.) On March 14, 2013, MedChoice's counsel's responded:

> MedChoice is not in a position to provide the data from the XRMS
> database in electronic form. There is no one affiliated with MedChoice
> who could process the data or perform the required work, and MedChoice
> does not have the financial resources to hire someone to do so. MedChoice
> estimates that it would cost somewhere between $3,000 and $10,000.

(Fuhrer 3d Decl., Ex. X, PageID 1124.) After further inquiry by defendants' counsel,

MedChoice's counsel stated in a March 15 email that their client did not have a cost

estimate by a vendor. The $3,000 - $10,000 estimate was made by defendant Hall. His

qualifications to make the estimate were not provided. Further, without explaining why

a database that at least at the time of the events at issue in the lawsuit was active

business data, could not now be accessed electronically[6], MedChoice asserted that the

individual files were encrypted and would have to be decrypted. MedChoice has not

produced any documents from the database in either an electronic or a paper format.

None of the proffered explanations support denying defendants access to the

XRMS database in an electronic format. This database, which was not revealed to

defendants until after I issued the October 26 order compelling discovery, is at the heart

of this lawsuit. The data represents the nuts and bolts of how MedChoice used Program

---

[6]Once it decided to file this lawsuit, MedChoice had the legally binding obliga-
tion to preserve all evidence relevant to those claims and defendants' defenses to them.
Since this was active data at the heart of its business, its hard to understand why it is
now inaccessible and/or burdensome to produce.

Agreement monies. Defendant World Financial Network Bank maintains that Med-Choice was not paying providers with the funds WFNB transmitted to MedChoice. MedChoice maintains that it performed the contract, but WFNB's breach caused it to be unable to pay providers.

MedChoice's unsupported assertion that it does not have the ability to produce the XRMS database in electronic form and that it cannot pay an outside vendor to do so fails to meet its obligation to prove that the production would be burdensome. Accordingly, it is ORDERED that **within 14 days of the date of this Order** MedChoice produce the sampling of the XRMS database previously agreed to in an electronic form or, alternatively, provide defendants with an exact duplicate of the database.

**Motion to compel responses to Interrogatory No. 1 and Requests for Production of Documents Nos. 71, 75 and 81.** Interrogatory No. 1 seeks all bank accounts held by MedChoice. Request No. 75 seeks all documents relating to those bank accounts. The interrogatory and request were originally a part of the motion to compel but were withdrawn when MedChoice represented it would produce its financial statements and related draft and work papers; account numbers and bank names for all its bank accounts; all documents relating to its bank accounts, funding accounts, depository accounts, automatic clearing house accounts, and brokerage accounts; and all documents responsive to Request No. 75. But as of February 1, 2013, MedChoice had identified eleven bank accounts and produced only seven bank statements.

MedChoice asserts that it produced financial statements a year ago in response to

a subpoena from WFNB in a related case and that it produced additional financial

statements in its more recent ESI production. (Stinchcomb Decl. ¶¶6-9,Doc. 66-1,

PageID 999.) MedChoice states that it has answered Interrogatory No. 1, produced all

bank statements and other documentation in its possession, and has not opposed

subpoenas to the banks. If defendants cannot obtain particular bank statements,

MedChoice will cooperate in an attempt to obtain them.

       Defendants respond that another party, CosmetiCredit subpoenaed the financial

statements in the related litigation. The protective order in that case prohibits there use

in any other litigation. (Fuhrer 3d Declaratory., Ex. DD, December 12, 2010 Protective

Order, p. 2, ¶ 3, PageID 1158.) Defendants ask that MedChoice be deemed to have

waived its confidentiality right under the *CosmetiCredit* case protective order precluding

use of the bank statements in other litigation. It is SO ORDERED. Defendants may,

subject to the protective order in this lawsuit, use the bank statements MedChoice

produced in the *CosmetiCredit* case for any purpose in this lawsuit.

       As to financial statements, there are only fourteen documents MedChoice

identifies as financial statements in the ESI it has produced. Eight of these are for the

period ending December 31, 2008. The fact that others have produced financial

statements is irrelevant. MedChoice must make a search asking all persons

knowledgeable about the likely location of financial statements, whether employees,

former employees, or third parties, for the years in question. MedChoice is ORDERED

to search again, thoroughly, and produce **within fourteen (14) days of the date of this**

**Order** all financial statements for the 5 years requested.

**Documents relating to Hall's personal finances.** Request for Production No. 71 seeks Hall's financial statements and all supporting documents. Request for Production No. 81 seeks Hall's income tax returns and related documents. Defendants withdrew their motion to compel answers to these request after Hall promised to produce documents related to his finances for the period September 20, 2005 through September 10, 2010. Before the motion to compel was filed, Hall produced no personal financial statements and two individual income tax returns (for 2009 and 2010).

Hall responds that there was a copy of his individual income tax return for 2008 in MedChoice's ESI production. But as noted earlier, that production was not of the records as kept in the ordinary course of business and defendants did not identify which requests for production the documents were responsive to. Rule 34(b)(E)(i), Fed. R. Civ. P. After the motion to compel was filed, Hall produced his 2007 individual income tax return. Hall states that he does not have his 2005 or 2006 individual income tax return in his possession and that he has no personal financial statements in his "possession, custody, or control." (Hall Decl., ¶¶ 15 and 16, PageID 1004.) That statement cannot be literally true, since Hall can obtain his income tax returns from the IRS. If defendants' counsel provides him with a form requesting his individual income tax returns fo the years 2005 and 2006, defendant Hall is ORDERED to execute it within fourteen (14) days of receiving it and either return it to defendants' counsel or deliver it by certified mail to the IRS. *See, Grant v. Target Corp.,* 281 F.R.D. 299, 307-08 (S.D. Ohio

14

2012).

If defendants do not credit Hall's assertion that he has no personal financial statements for 2005 - 2010 within his possession, custody or control, they are free to depose him about how he conducted the search for financial statements, whether he sought them from his personal assistants, accountants, attorneys, banks or other third parties to whom he gave or entrusted them, and the like. If his sworn statement is not accurate, he may be subject to sanctions. *Bratka v. Anheuser-Busch Company, Inc.*, 164 F.R.D. 448, 461-64 (S.D. Ohio 1995).

**ESI from custodians Anthony Girardi and Joann McLaughlin.** Plaintiffs represented they had possession of computer hard drives belonging to Anthony Girardi and Joann McLaughlin. (Fuhrer 2d Decl., ¶ 9 and Ex. G, PageID 925 and 950-51.) Plaintiffs' counsel identified Giardi's hard drive as likely containing discoverable information. (Fuhrer 2d Decl., ¶ 10 and Ex. H, PageID 925 and 952.) When plaintiffs produced ESI, the production did not include any documents from Giardi. On December 13, 2012, defendants' counsel asked plaintiffs' counsel to confirm whether there was searchable data for Giardi and asked defendants' counsel to run the search terms against the data of Joann McLaughlin. (Fuhrer 2d Decl., ¶ 11 and Ex. I, PageID 925 and 961.) Defendants' counsel sent followup emails to plaintiffs' counsel on January 8 and 21, but got no response. (Fuhrer 2d Decl., ¶ 12 and 13 and Exs. J and K, PageID 925, 964 and 968.)

Despite its June 2012 statement that it had custody of Giardi's hard drive and

that it likely contained discoverable information, MedChoice now asserts it does not have any identifiable custodial data for Giardi. It offers no evidence and no declaration under penalty of perjury to support that assertion. Instead, it cites Doc. 63-10. That references exhibits attached to Loriann E. Fuhrer's February 1, 2013 declaration offered in support of defendants' motion to compel. Within Doc. 63-10 is a February 6, 2013 email from Andrea Perry Block to Lori Fuhrer and LouAnne Conrad. ( Fuhrer 2d Decl., PageID 961-63.) In relevant part, the email states that it includes "a list of custodians whose computer hard drives we have in our possession." (PageID 962.) That list includes both Anthony Giardi and Joann McLaughlin. (PageID 963.) There is nothing in the email suggesting that MedChoice has no identifiable custodial data from Giardi's hard drive.

As to McLaughlin, MedChoice argues that it should not have to access her hard drive because it was not included among the hard drives plaintiffs and defendants agreed would be search using their agreed search terms. Plaintiffs do not want to spend the additional money required to search McLaughlin's hard drive. They provide no evidence supporting their burdensomeness argument.

It is ORDERED that plaintiffs search the Giardi and McLaughlin hard drives and produce all non-privileged relevant documents **within fourteen (14) days of the date of this Order.**

**Sanctions.** When a motion to compel discovery is granted, "the court shall, after opportunity for hearing, require the party . . . whose conduct necessitated the motion . .

16

. to pay the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." Rule 37(a)(4), Fed. R. Civ. P.  The "great operative principle of Rule 37(a)(4) is that the loser pays."  Wright & Miller, Federal Practice and Procedure:  Civil §2288 at pp. 657-58 (1994).  *E.g., Merritt v. Int'l. Brotherhood of Boilermakers*, 649 F.2d 1013, 1018 (5th Cir. 1981).

Here plaintiffs opposition to the motion to compel was not substantially justified and there are no other circumstances that would make an award of attorney fees unjust. Accordingly, within fourteen days of the date of this order, defendants' counsel are DIRECTED to provide plaintiffs' counsel with a statement of their attorney fees incurred filing and briefing the motion to compel. If plaintiffs contest the reasonableness of those fees, they must file a motion **within twenty-eight (28) days of the date of this Order** explaining why the fees requested are unreasonable and, if they have evidence to offer to support that position, requesting a hearing.

I believe other sanctions may be mandated by Rule 37(b)(2)(A) and Rule 37(b)(2)(C), Fed. R. Civ. P. However, I do not believe I am in a position to make that judgment on the present record. Defendants may renew their request for sanctions after all discovery is completed, either by filing a separate motion or incorporating the request in their motion for summary judgment.

If any party objects to this Report and Recommendation, that party may, within

17

fourten (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk of Court is DIRECTED to mail a copy of the complaint and this Report and Recommendation to each defendant.


s/Mark R. Abel
United States Magistrate Judge

18